HANLEY v. SWEENY et al.

(Circuit Court of Appeals, Ninth Circuit. May 6, 1901.)

No. 615.

1. FRAUD—RETENTION OF BENEFITS—EQUITY.
    Where, by fraud and misrepresentation to defendants' agent, complainant procured the insertion of his name as purchaser in an order confirming an administrator's sale of an interest in a mine and in the administrator's deed, when defendants' bid was the only one received and acted on, a court of equity should not assist him to retain the benefit of his fraud by setting aside a subsequent deed, which the administrator was compelled to issue to defendants by mandamus in the state courts.

2. SAME—PARTNERS—CONCEALMENT OF VALUE—DEED—DELIVERY.
    The parties were partners in certain mining enterprises, and jointly owned an interest in a claim, in which complainant also owned a separate interest. Defendants, by tunneling from an adjoining mine, managed by them, discovered an extensive and valuable vein of ore in such claim, and, concealing such fact from complainant, procured an option on his interest, and execution and delivery in escrow of a deed therefor, and afterwards, by fraud, and without payment therefor,

obtained possession of the deed. *Held*, that such deed should be set aside as fraudulent and void, both because of such concealment and because never delivered.

Appeal from the Circuit Court of the United States for the North-ern Division of the District of Idaho.

John R. McBride and M. A. Folsom, for appellant.

W. B. Heyburn, E. M. Heyburn, and L. A. Doherty, for appellees.

Before GILBERT, ROSS, and MORROW, Circuit Judges.

ROSS, Circuit Judge. This was a suit in equity, brought by the appellant, as complainant, to obtain a decree annulling two certain deeds made to the defendants Charles Sweeny and F. Lewis Clark, —one by the administrator of the estate of one David McKelvey, deceased, under an order made in a proceeding in mandamus, for an undivided one-third interest in the Skookum mine, situated in Shoshone county, Idaho; and the other by the complainant him-self to the defendants Sweeny and Clark for an undivided one-eighth interest in the same mine. The complainant also, by his bill, asked for an accounting of the profits derived by the defend-ants from working the mine, and also sought an order appointing a receiver to take possession of and operate the property pending the litigation. The claims of the complainant in respect to the two interests rest upon distinct and independent grounds. The one third interest belonged to David McKelvey during his life. The rec-ord before us shows that that interest was first appraised in the proceedings had in respect to the estate of McKelvey at $3,000, and that the complainant, Hanley, and the defendants Sweeny and Clark all wanted to get it. The Chemung Mining Company is also a factor in the case. That company was incorporated under the laws of the state of Washington by the defendants Clark and Sweeny and one W. E. Goodspeed, who, it appears from the evidence in this case, was a clerk in their office at Spokane; its articles of incorporation bearing date August 5, 1896, and its capital stock being declared to be $2,500,000, divided into 500,000 shares of the par value of $5 each. On the 11th day of August, 1896, an agree-ment in writing was entered into between the complainant, Han-ley, as party of the first part, and the defendants Clark and Sweeny, as parties of the second part, and witnessed by W. E. Goodspeed, by which Hanley, in consideration of the sum of $5,000, paid and to be paid in certain specified amounts and at certain specified times, undertook to sell to Clark and Sweeny an undivided one-fourth interest in those certain mining claims described as follows, to wit: "The Jersey Fraction Mining Claim, the Lily May Mining Claim, the Carriboo Mining Claim, the Good Luck Mining Claim, and the Butte Mining Claim, all situate at Wardner, Yreka mining district, Shoshone county, Idaho, and west of the Last Chance Min-ing Claim;" the agreement proceeding to provide as follows:

"The party of the first part also agrees that all of the titles to these prop-erties shall be cleaned up by him, and that said properties shall then be deeded to the Chemung Mining Company, of Spokane, Washington, the

owners of which shall be as follows: Chas. Sweeny, one-half interest of said company; F. Lewis Clark, one-fourth interest of said company; and Kennedy J. Hanley, one-fourth interest of said company. The parties hereto agree to set aside one-fifth of their holdings of the stock of said company, respectively, to be used for treasury purposes. The money to clean up the title of the said properties, not to exceed the sum of five thousand dollars, to be furnished by the parties of the second part in sums as required under the direction of Chas. Sweeny."

The undisputed evidence in the present case is that of the 500,000 shares of the stock of the Chemung Mining Company Hanley owned 100,000 shares, Clark and Sweeny 300,000 shares, and that 100,000 shares were held as treasury stock of the company. The Skookum was a neighboring mining claim, the interest of the McKelvey estate in which, the evidence leaves no room to doubt, Hanley, Clark, and Sweeny wanted to acquire, and wanted to get for as near nothing as possible. This is shown not only by the testimony of each of them, but by documentary and other evidence that we find in the record, a part of which will be mentioned. The order of the probate court under which the McKelvey interest in the Skookum mine was undertaken to be sold and conveyed by the administrator of the estate is referred to in the brief of appellant's counsel, and in parts of the record, as having been made December 5, 1896, although the order itself appearing in the record purports to have been made November 30, 1896. Clark and Sweeny were the principal officers of the defendant Empire State-Idaho Mining & Developing Company, of which one W. Clayton Miller was resident manager and consulting engineer. A. G. Kerns was the attorney of the Chemung Mining Company. On the 14th day of December, 1896 (but a few days after the making of the order by the probate court of Shoshone county for the sale of the McKelvey interest in the Skookum mine), Clark wrote to Miller as follows:

"I have tried for three days to get you by telephone, but have failed. After full consultation with Mr. Hanley, it seems to me, if he can buy McKelvey's claim on the Jersey for about the sum net to us, viz. $400, that he expects to get it for, it better be done now on general principles, and to get through with it; and if at the same time he can, by paying $100 or so, obtain an option on one-third of the Skookum at about $700, so much the better. It does not seem to me, however, that we better put off too long in getting the Jersey interest cleaned up. I should not want to enter into an agreement to buy the Skookum, but would be willing to pay one hundred dollars or so to get an option on the interest. If you and Mr. Hanley think best, however, to postpone the Jersey matter, I shall be satisfied to rest upon your judgment."

Following this letter in the record, but without date, is the following:

"My Dear Kerns: Mr. Clark appears to have changed his mind, and I think now the best you can do is to put Kennedy [Hanley] onto the best and quickest way for him to close for the interest at his bid. He should, at the proper time, put it in as writing. As to Skookum, find out, and let me know; but do nothing now.        Miller."

Immediately following is this telephone message from Clark to Hanley:

"Mr. Miller telephoned, requesting that you immediately telegraph or telephone Cunningham [who was the administrator of the McKelvey estate]

withdrawing your bid on the Jersey tract. By so doing Miller says we can get a reappraisement to better advantage. Please comply. Just withdraw your bid, and give no reasons. You can telephone me at my house, 255, after 6:30 p. m."

At the time of the making of the order by the probate court of Shoshone county authorizing the administrator of the McKelvey estate to sell its interest in the Skookum mine, that interest stood appraised at the sum of $3,000. Hanley had bid therefor the sum of $700. The statute of Idaho provided that no bid should be accepted which was less than 90 per cent. of the appraised value of the property. No other bid appearing to have been made, the McKelvey interest in the Skookum mine was again appraised in February, 1897, and that time at $760. The administrator of the estate again published and posted notice that he would sell the interest on May 1, 1897, and invited bids therefor. In his return to the probate court of the sale made by him, the administrator, after setting out the notices that he caused to be published and posted, stated:

"That on the 1st day of June, 1897, this administrator received an offer or bid of seven hundred dollars for the undivided one-third interest in the Skookum lode mining, situated in Yreka district, Shoshone county, state of Idaho, from the Chemung Mining Company. That being the only bid filed with me, and that being the highest and only bid for the same. I did on said day sell said real estate to the said Chemung Mining Company, the purchaser thereof, and request that said sale be confirmed; and, further, that the court fix a date and place for a hearing upon said sale."

This return was made and filed June 15, 1897, but was not verified, as was required by the Idaho statute. On the 18th of June following, an order was made by the probate court designating June 30, 1897, at 10 o'clock a. m. of that day, at its court room in the town of Murray, Shoshone county, as the time and place for the hearing of the return, at which any person interested might appear and file written objections to the confirmation of the sale. That hearing was continued to July 26, 1897, on which day Hanley and the administrator appeared in court, as also W. W. Woods, who had theretofore been the attorney for the administrator in the matter of the estate of McKelvey. Hanley's testimony is to the effect that, after the making of the $760 appraisement, and after the publication of the notice of sale pursuant to that appraisement, he presented to the administrator a bid of $700 for the McKelvey interest; but such a bid, if made, does not appear among the files of the estate in the probate court, and has not been produced. As a matter of fact, however, the night before the 26th day of July, 1897, Hanley gave to the administrator $750, which he said was a raise of $50 on his bid. The paying of this money in advance of any confirmation of the sale, and before the petition of the administrator for its confirmation to the Chemung Company had come on for hearing, is one of the many peculiar circumstances attending the attempted disposition of the McKelvey interest. Concerning what took place the next day, July 26th, when the matter of the sale came up before the probate court, there is some conflict in the testimony. The bid of the Chemung Mining Company was submitted to the administrator by A. G. Kerns, its attorney, who resided at Wallace, Idaho, and who had an office

with Mr. Woods at that place, and who requested Mr. Woods to attend the confirmation proceedings at Murray, the county seat (to which place he was going), and look after the bid of the Chemung Company. Woods' testimony is to the effect that he went into the office of the probate judge for that purpose in the forenoon of July 26th; that Cunningham, the administrator, and the probate judge, were there; that subsequently Hanley came in; "but," said the witness, "the first inquiry addressed to me was by Mr. Cunningham [the administrator], who stated that there had been a raise of $50 upon the bid then in. And he and Judge Whalen [the probate judge] wanted my opinion as to what to do in the matter. I inquired as to whether the advance was by the same bidder, and Mr. Cunningham replied that it was the same bidder, and that he had voluntarily raised his bid $50. I said, 'That is a rather queer proceeding,' and I took down the statutes, and called their attention to the provisions of the statute that, if a bid was not raised to the extent of ten per cent., it would not require a new publication. I said, then, in my opinion there was no objection to the administrator taking $50 more for the benefit of the estate, if it was the same bidder, and that my advice to the probate judge would be to confirm the bid as made, and not mention that $50; and my advice to Cunningham as administrator was to take it up on his account for the benefit of the estate, and confirm the bid which was already in writing. That is all that I remember of that transaction, except they agreed to act upon the advice. The administrator and the probate judge both agreed upon that course of conduct." The witness further stated that the administrator requested him to have a deed prepared when he returned to Wallace, and he replied that he would speak to Mr. Kerns about it. As a matter of fact, the probate judge himself, on the same day, to wit, July 26, 1897, prepared an order confirming the sale to the complainant, Hanley, and he testified in this suit that when he was making out that order Hanley, Woods, and the administrator were all present, and that while doing so he asked in the presence of all three of them, "Whom will I make this out to?" and that Hanley replied, "Make it out to me; it is my own money that is paying for it;" and that Woods assented thereto. If that testimony of Hanley is true, Woods could not be a man of honor and integrity, as complainant's counsel here concedes him to be; for he attended the confirmation proceedings at the request of the attorney of the Chemung Company, and for the purpose of having the sale confirmed to it in pursuance of its theretofore accepted bid. Woods' testimony is to the effect that nothing of the kind occurred. The probate judge signed the order confirming the sale to Hanley, and the administrator thereupon executed a deed to him purporting to convey to him the one-third interest of the estate in the Skookum mine. The 26th day of July, 1897, was a day of the regular July term of the probate court of Shoshone county, section 3843 of the Revised Statutes of that state providing that:

"The terms of the probate court in the several counties for the transaction of all probate business, except that specially authorized by law to be done in vacation, must be held on the fourth Monday in each month. For the trans-

action of all civil, other than probate business, and all criminal business, these courts are always open."

The next section is as follows:

"The terms of the probate court must be held at the county seats. There shall be a clerk of said court to be appointed by the judge thereof, or the probate judge may act as clerk of his own court. Every probate judge shall be responsible upon his official bond for every default or misconduct in office of his clerk."

On the 12th day of August, 1897, Kerns, who had presented the bid on behalf of the Chemung Mining Company, appeared at the office of the probate judge, and stated to him that a mistake had been made in confirming the sale to Hanley, and that the Chemung Mining Company was the party entitled to the deed; that Hanley's conduct and representations by which he had procured the confirmation and deed to himself were fraudulent. And Kerns presented to the probate judge an order reciting, among other things, that the matter of the confirmation of the sale came on regularly to be heard July 26, 1897, the administrator appearing in person and by his attorney, W. W. Woods, and "Kennedy J. Hanley appearing in person representing himself to appear on behalf of the purchaser at the administrator's sale, and the court having examined the said return and heard the testimony of witness in support thereof," and it duly appearing to the court that in pursuance of the order of sale the administrator caused the proper notice to be posted and published, and that the sale was made to the Chemung Mining Company, and further reciting "that on the 26th day of July, 1897, an order was made by this court confirming the sale of said real estate and mining premises in one Kennedy J. Hanley, and directing said administrator to execute proper and legal conveyance thereof to said Hanley upon the same bid of $700; and it appearing to the satisfaction of the court that such order confirming said sale in Kennedy J. Hanley was obtained by misrepresentation and fraud upon the part of said Kennedy J. Hanley in pretending to represent the said Chemung Mining Company,"—proceeded to vacate and annul such order and deed, and to confirm the sale to the Chemung Mining Company, and to direct the administrator to execute a conveyance of the McKelvey interest to that company. The probate judge at first refused to sign the order so requested by Kerns, but subsequently, being urged to do so, and, as he testifies, being threatened by Kerns with a suit if he did not, affixed his signature to the order, without any notice to Hanley, and without any proof of any kind. The order was then left with the probate judge, who, under the provisions of the Idaho statute, acted as clerk of his own court, and who subsequently advised the administrator that the order so signed was void. The administrator, upon demand made on behalf of the Chemung Mining Company, refused to execute a deed to it for the interest of the McKelvey estate in the Skookum mine, and thereupon that company applied to the district court of Shoshone county for a writ of mandamus to compel the administrator to make the conveyance directed by the order. The district court decided that it was the duty of the administrator to obey the order of August

13, 1897, and the supreme court of the state on appeal affirmed the judgment. People v. Cunningham (Idaho) 53 Pac. 451. The administrator having, subsequent to the decision of the district court, deposited a conveyance, as required by the statute of the state, to abide the appeal, that conveyance was, after the decision of the supreme court, delivered to the Chemung Mining Company, and was put on record in the county in which the property is situated; and its title, if any, was thereafter conveyed to the defendant Empire State-Idaho Mining & Developing Company.

In the view we take of the present case, it is not necessary to consider the legal effect of the very peculiar proceedings in the probate court, nor to determine the effect of the decisions of the state courts of Idaho in the cases growing out of them which have been brought to our attention; for we are clearly of the opinion that in respect to the McKelvey interest the complainant is not, by the facts and circumstances of the case, presented in such an attitude as that a court of equity should afford him any relief in respect to that interest. The evidence leaves no room for doubt that the intent of the complainant and of the defendants Clark and Sweeny was to acquire the group of claims of which the Skookum was one, in common ownership, although in different proportions. The three were the sole owners of the stock of the Chemung Mining Company, which company bid $700 for the interest of the McKelvey estate in the Skookum mine. Of that bid the administrator, of course, had actual notice, for it was made to him; and in his return to the probate court he expressly stated that under the proceedings had pursuant to the $760 appraisement of that interest he had sold it to the Chemung Mining Company, and asked the confirmation of the sale to it; and, furthermore, the administrator, in his return, expressly stated that the bid of the Chemung Company was the only bid he had received for that interest. Hanley, like every one else dealing with the administrator in respect to that interest, is certainly chargeable with constructive notice of the matters stated in that return, and we think the circumstances of the case irresistibly lead to the conclusion that he had actual notice of the bid of the Chemung Company, and that the administrator had reported to the court his sale of the interest in question to that company; otherwise, why should he have paid to the administrator $750 the night before the day the hearing of the administrator's petition for the confirmation of his reported sale to the Chemung Company for $700 was to be had? Hanley claims to have himself theretofore made to the administrator a bid of $700 for that interest, which bid, however, nowhere appears among the papers of the estate, nor was it produced in this case; and the administrator, in effect, reported to the court that no such bid had been received by him, for, as has been seen, he expressly stated in his return that the only bid he received for the property was that of the Chemung Mining Company. If it be true, as claimed by the complainant, that he had in fact bid $700 for the McKelvey interest under and pursuant to the order of sale of November 30, 1896, and it be further true that Hanley did not, in fact, know of the bid of the Chemung Company, then, and in that event, his voluntary raise of

his own bid, in the absence of any other, is "peculiar," to say the least. In that view his action has not been, and cannot be, satisfactorily explained, unless it be based upon some sort of philanthropic motive, which, under the facts and circumstances of the case, we would hardly be justified in attributing to either him or the defendants Clark and Sweeny in their efforts to acquire the McKelvey interest. If, on the other hand, it be true that Hanley did actually know of the bid of the Chemung Mining Company, and it be also true that he himself had also bid $700 for the same interest, the statements made and assented to by Hanley and the administrator before the probate judge in the presence of Woods, when the matter of the confirmation of the sale came on for hearing on the 26th of July, 1897, cannot be explained consistently with good faith and fair dealing either on the part of Hanley or the administrator. The counsel for the appellant here concedes that Woods, who had been requested by Kerns to look after the confirmation of the sale to the Chemung Company in pursuance of its accepted bid, did not know of any bid of Hanley, or any other party than the Chemung Company. Therefore, when told by the administrator, in the presence of Hanley and the judge, that the bid had been raised, and when in response to his question, "By whom?" he was informed that it was by the "original bidder," he very naturally said such a proceeding was "queer." Being there in the interest of the Chemung Company, if either Hanley or the administrator had said that the $50 raise was by Hanley, Woods would have at least had the opportunity of seeing that the sale made to the Chemung Company pursuant to its bid, and reported by the administrator for confirmation, was not, as in fact it purported to be, confirmed to Hanley for the similar sum of $700. This manifest deception of the representative of the Chemung Company, coupled with the facts that the administrator had theretofore accepted the bid of that company, and so reported to the court, expressly stating at the same time that there was no other bid, and no other bid being in fact produced, supplemented by the extraordinary payment by Hanley to the administrator of the $750 the night before the day set for the hearing of the administrator's petition for the confirmation of his previously reported sale to the Chemung Company for $700, and the withholding of notice of such payment from the court as well as that company when the accepted bid of the company came up for consideration, discloses such deceit and fraudulent practices as preclude any and every person in any manner engaged in them from the aid of any court of equity.

But all of the fraud in the case was by no means committed by the complainant. The one-eighth interest in the Skookum mine here involved was confessedly the property of Hanley. So were 100,000 shares of the stock of the Chemung Mining Company. In respect to that interest the court below held that Hanley dealt with the defendants Clark and Sweeny at arm's length. There is not the slightest doubt that the letters from Hanley to O'Neil, introduced in evidence, and written a few weeks before the making of the contract of April 30, 1898, show that there was an absolute want of confidence on his part in either Clark or Sweeny, so that the court below was quite

right in saying that any pretense that in the agreement to dispose of his one-eighth interest Hanley relied upon any representations of Clark and Sweeny, or either of them, was without any valid support. But that is no answer to the proposition that they fraudulently withheld from their co-owner the facts in respect to the discovery of ore in the Skookum mine, made in pursuance of work prosecuted by the company, in which he was a stockholder, and at his expense, of course, as well as theirs. That they did so withhold and conceal such facts is abundantly shown by the record, and, indeed, affirmatively appears from their own testimony. The Skookum mine was reached underground only through a tunnel that had its commencement in the ground of the Last Chance Mining Claim, of which the defendants Clark and Sweeny were the principal owners, and of which one Presley was superintendent. The underground work done in the Skookum mine was done also under the superintendency of Presley, and engaged under him was, among others, a shift boss named Kendall. Presley's testimony is to the effect that in running the diamond drill into the Skookum ground, under the direction of Clark and Sweeny, he discovered, about April 24 or 25, 1898, a body of ore in the Skookum, into which, by the 30th day of that month, a drift had been driven about 35 or 40 feet, disclosing a body of ore of such dimensions and value as that Presley, when asked to give his estimate of the value of the Skookum mine in its condition on the 30th of April, 1898, when the contract between Hanley and Clark and Sweeny was made, answered: "Judging from the prices you would have to pay for mines similar to that, it would be in the neighborhood of two hundred and fifty or three hundred thousand dollars. I don't know that you could get one for that price that was similar." Presley further testified that Clark and Sweeny were fully apprised of the ore discovery, but that Hanley was not, and, what is more, that Hanley was kept in ignorance of it by the express orders of Clark and Sweeny. We extract from his testimony:

"Q. By Complainant's Counsel: I will ask you if, during the month of March or April, 1898, any application was made to you by Mr. Hanley. to go into that mine and examine it? A. Yes, sir. Mr. Hanley asked me if he could go through the mine. Q. Did he state any reason why he wanted to go into the mine? A. He said he had interests in the mine, and that he was entitled to go through. I told him I was instructed by Mr. Sweeny not to allow him to go into the mine. Q. State whether or. not, acting under those directions, you prevented him from going. A. Yes, sir; I prevented him. Q. What did you say to him? A. I merely told him that he could not go in the mine; that I was prohibited from allowing him to go into the mine. Q. Do you recollect whether he asked you more than once the privilege of going in? A. Yes, he did. I believe he asked just before he gave an option on his interest to Sweeny. Q. How long before? A. Well, I think it was the day before, if I remember right, or a day or two. I don't just remember. I know it was shortly before. Q. And you prohibited him from going in under the direction of Mr. Sweeny? A. Yes, sir. Q. Did you tell Mr. Hanley about what the true condition of the mine was at that time, or did you give him any information about it? A. I told him there was nothing in there to speak of. Q. I will ask you now if Mr. Sweeny instructed you or Mr. Clark not to disclose the condition of the mine to either Mr. Hanley or anybody else. A. Yes, sir; I was instructed so by Mr. Sweeny. Q. And you did not? A. No, sir; I did not. Q. Did you know anything about the negotiations between Hanley and Sweeny and Clark about the

sale of his interest in the Skookum mine? A. Yes, I did. Q. Did you know anything about those negotiations either from Mr. Sweeny, or Mr. Clark, or both of them? A. I did not know personally through them, but I knew that they were making a deal. Q. That was before the deal was made, as you understood? A. Yes, sir. I knew it at the time. Q. You knew it was in contemplation? A. Yes, sir. Q. Did you have any conversation with them, or either of them, about their having made a deal with him, after it was done? A. Nothing only what Mr. Sweeny told me. Q. Mr. Sweeny told you? A. Yes, sir. Q. About what time was it that he told you? A. Well, if I remember rightly, it was about the first of May of 1898. Q. What did he say about his negotiations with Hanley about the deal? A. He came up from Spokane one afternoon, and in the evening about 7 or 8 o'clock he told me that he had secured an option on Kennedy Hanley's interest in the Chemung for $20,000, and his interest in the Skookum for $10,000. Q. Did you know what Mr. Hanley's interest was in the Chemung,—what it consisted of? A. I understood it to be a third and an eighth. Q. No; I mean in the Chemung, not in the Skookum. A. Oh! in the Chemung. I understand he had some stock, and some interest besides, in the first; but I don't know what it terminated in afterwards. Q. What interest did Mr. Sweeny say he had got in the Chemung? A. Why, he didn't state in particular what interest it was. He said he had his interest in the Chemung for $20,000, all his interest. That is all I heard him say. Q. And what did he say about the Skookum? A. He said 'an option on his interest in the Skookum for $10,-000.' "

Presley further testified that Kendall was the shift boss in charge of the work that penetrated the ore body referred to, and that about the latter part of May, 1898, he (Presley) discharged him. When asked why, Presley answered:

"Why, he came to me a short time before,—I don't remember the time,—but he asked me questions in regard to the Skookum ground, and if Kennedy Hanley did not own interests in there. I did not make him any answer. I simply laid him off the first opportunity I got. Q. What was the reason? Why did you lay him off? A. Well, my instructions were to not allow any one to know any more about it than possible. That was one of the reasons. Q. Was it not, Mr. Presley, for the purpose of protecting the interests of your employers, Sweeny and Clark? A. Yes, that was my idea of it, and that is what I tried to do right along. Q. Did you ever admit any other person into that mine along about that time? A. Why, I never admitted any one at my own responsibility, unless they were with Mr. Sweeny. Mr. Sweeny brought some men there with him,—some that come from the East. Q. When did he bring men there? A. Along the first of May."

Kendall's testimony is to the effect that shortly before his discharge, and about the time the ore was struck in the Skookum mine, he told Presley that he had met Hanley on the street the evening before, and that Hanley had asked him "concerning this drift,—how far we were in, and if we had any ore, and I said I gave him no set answer. He kind of smiled, and says, 'Well, maybe he has an interest in it,' and walked off." The witness further said that he did not think that he told Presley exactly what he had replied to Hanley, and in answer to the question, "But you did not tell Hanley anything?" answered: "No, not exactly. I told him there was some ore. I did not give him any decided answer." And Kendall was discharged for the reason already stated. Clark himself says in his evidence that, when asked by Hanley concerning the mine, he said that they "had some encouragement," but he expressly states that he omitted "details." He further admitted in his testimony that the "fairness" of contracting for Hanley's interest without telling him what he knew

109 F.—46

"was not considered" by him. Yet within a few days of the discovery of the large and valuable ore body in the mine, Clark telephoned to Hanley, requesting him to come to Spokane, and on his arrival met him at his hotel, and began negotiations which culminated in the contract of April 30, 1898. A grosser fraud upon a co-owner of the property it is difficult to conceive. Now, what was the contract of April 30, 1898? At that time the mandamus proceedings against the administrator of the McKelvey estate to compel him to execute a deed for the one-third interest of that estate in the Skookum mine to the Chemung Mining Company in pursuance of the order of the probate judge made August 13, 1897, were still pending in the supreme court of the state of Idaho, and that interest was then still being claimed by Hanley under the deed executed to him by the administrator, and by Clark and Sweeny as the property of the Chemung Mining Company. The proposition made by Hanley to Clark and Sweeny on that day, under and pursuant to the negotiations initiated at their request, was in writing, and is in evidence. It is as follows:

"My proposition is this: I will sell my one hundred thousand (100,000) shares in the Chemung Co. (at 20 cents a share) for twenty thousand dollars ($20,000.00). I will sell my ⅓ and ⅛ interest in the Skookum claim at the rate of thirty thousand dollars for the whole claim.
"Spokane, April 30th, 1898.                  K. J. Hanley."

Hanley's testimony is to the effect that throughout the negotiations leading up to the contract he refused to sell the one-eighth interest in the Skookum mine, which he confessedly owned, without including also the McKelvey one-third interest, which was in dispute between the parties; and the defendant Clark himself seems to admit as much, although his testimony is to the effect that Hanley finally agreed otherwise. On his cross-examination Clark was asked:

"Q. Did Mr. Hanley at any time ever offer to sell you either the one-eighth or the one-third interest in the Skookum mine separately from the other interest—separately from each other? A. He did offer to sell them separately from each other. Well, that is to say— No, he never at any one time said— He never at any one time entered into negotiations about the one-eighth without having a negotiation at the same time about the one-third. Q. The negotiations always covered both of his claimed interests, you denying that he had any interest in the one-third, and he claiming that he had, and you admitting that he owned a one-eighth interest? A. I think I asked Hanley at one time to put a price on everything he owned and everything he claimed up there, and he, in general, answered that he wanted to put a price on the whole of it; but when he came down to actually agreeing upon something we agreed as I have said."

The written proposition of Hanley, by which he offered to sell the one-third and one-eighth interests at the rate of $30,000 for the whole claim, would, as will readily be seen, make those interests amount to something over $12,000, and Hanley admits that in the subsequent discussion of his written proposition he receded from that to the extent of finally agreeing to take for those two interests $10,000, and $20,000 for his 100,000 shares in the Chemung Company. The testimony of Clark and Sweeny, on the other hand, is to the effect that the final agreement was $20,000 for the Chemung stock

and the one-eighth interest in the Skookum mine, and $10,000 for the McKelvey one-third interest. It is not disputed that the papers in respect to the transaction were to be, and in fact were, placed in escrow. The papers were prepared in the office of Clark and Sweeny on Saturday morning, April 30, 1898, in some haste, in order that they might be deposited in a bank before the closing hour of 12 o'clock of that day. Separate deeds were prepared for the two interests in the Skookum mine, and each was signed by Hanley in Clark and Sweeny's office. All three of them at the same time signed an indorsement upon each of two envelopes prepared by a clerk of Clark and Sweeny, and under the latter's dictation, one of which reads as follows:

"This envelope is placed in escrow with E. J. Dyer, cashier of the Exchange National Bank of Spokane, Wash., on the following terms and conditions: If Chas. Sweeny and F. Lewis Clark shall pay into said bank, for the credit of Kennedy J. Hanley, eighteen thousand dollars ($18,000.00), on or before July 1st, 1898, then this envelope, with its contents, shall be delivered to said Sweeny and Clark; otherwise, it shall be delivered to Kennedy J. Hanley.

"Dated at Spokane, Wash., this 30th day of April, A. D. 1898."

And the other:

"This envelope is placed in escrow with E. J. Dyer, cashier of the Exchange National Bank of Spokane, Wash., on the following terms and conditions: If Chas. Sweeny and F. Lewis Clark shall pay into the said bank for the credit of Kennedy J. Hanley ten thousand ($10,000.00) dollars on or before August 1, 1898, then this envelope, with its contents, shall be delivered to said Sweeny and Clark; otherwise, it shall be delivered to Kennedy J. Hanley.

"Dated at Spokane, Wash., this 30th day of April, A. D. 1898."

There is no dispute in the evidence in respect to the fact that under the terms of the agreement of sale, whatever they were, Hanley was to be, and in fact was, paid $2,000 in cash in consideration of the options; and Hanley's testimony is to the effect that after the signing of the deeds and the indorsements upon the two envelopes he placed in the envelope requiring the further payment of $18,000 the certificate for the 100,000 shares of the stock in the Chemung Mining Company, and in the other envelope the two deeds for his interest in the Skookum mine, and that the three parties then left the office, and went to the bank, taking the papers along. At the bank was a notary public, before whom Hanley acknowledged the execution of the deeds, and received from Clark and Sweeny a check for $2,000. It is contended on behalf of Hanley that, while he went to the desk of one of the bank clerks to make some arrangement in respect to the check, and after the notary had returned the deeds with his certificate of acknowledgment thereon, Sweeny fraudulently put the deed for Hanley's undisputed one-eighth interest in the Skookum mine in the envelope with the certificate of stock in the Chemung Mining Company, containing the indorsement requiring the additional payment of $18,000, and in the other envelope placed the deed covering the McKelvey one-third interest in the Skookum mine, and in that condition the envelopes were sealed, and left with Dyer in escrow. The testimony of Clark and Sweeny is to the effect

that the papers were so placed, not only with the knowledge of Hanley, but that it was the distinct understanding and agreement that they should be so placed; the contract, according to their testimony, being that the $20,000 sale and purchase, if consummated, should embrace both the Chemung stock and the one-eighth interest in the Skookum mine, and that the $10,000 sale and purchase, if consummated, should embrace only the McKelvey one-third interest in the mine. There is no doubt that some support is added to this contention by the fact that separate deeds were executed for the one-third and one-eighth interests, while one might have been made to embrace both, and by the further fact that in one of the indorsements the time fixed for the exercise of the option was July 1, 1898, and in the other—that in fact covering the deed for the McKelvey one-third interest—was August 1, 1898, which latter date Clark and Sweeny testify was so fixed in order to give more time for the decision by the supreme court of Idaho of the mandamus case. But it must be remembered that all of the papers were prepared by Clark and Sweeny, and that it was at their suggestion that separate deeds were executed; and, while the fixing of August 1, 1898, as the date for the taking up of the deed for the McKelvey interest was very likely for the purpose of allowing more time for the decision of the mandamus case, that fact makes but little against Hanley's contention that the envelope bearing that indorsement was also to contain the deed covering the one-eighth interest. There can be no doubt that Hanley's proposition was to sell his stock in the Chemung Company for $20,000, and both of the interests claimed by him in the Skookum mine together for something over $12,000. There can be no doubt of that fact, for the proposition was in writing, and is in evidence. We think it quite certain, also, that throughout the negotiations preceding the final agreement Hanley insisted that the two interests, one of which he confessedly owned, and the other claimed by him, should go together, and that he would not sell to the defendants Clark and Sweeny one without selling both; for such is not only Hanley's testimony, but is practically admitted by Clark. From his written offer it appears that Hanley valued his stock in the Chemung Company at $20,000, and both interests in the mine together at but little over $12,000. And in the discussion that resulted in Hanley's reducing his price for those two interests to $10,000 it does not appear that Clark or Sweeny objected to his demand of $20,000 for the Chemung stock. Under such circumstances it does not appear to us reasonable, or at all probable, that Hanley would, as Clark and Sweeny contend he did, have finally agreed to sell the one-eighth interest in the mine, which he admittedly owned, in addition to the 100,000 shares of the stock of the Chemung Company, for $20,000. In that view, also, $10,000 would certainly appear to be an extraordinary and extravagant price for Hanley to demand, and Clark and Sweeny to agree conditionally to give, for the disputed one-third interest in the same mine. It appears further that on the 6th or 7th day of June, 1898, Clark and Sweeny applied to Hanley for an extension of the time within which to take up the escrows. They wanted until October 1, 1898, and agreed to pay Hanley $2,000 therefor, to

be applied on the purchase price. Hanley objected to making the extension run to October 1st, and September 20, 1898, was finally agreed upon. Clark testified that they only wanted the extension to apply to the Chemung stock and the one-eighth interest in the mine, as the supreme court of Idaho a short time before had affirmed the decision of the trial court in the mandamus case; but that Hanley insisted that it should also apply to the one-third interest therein, as he wanted "to keep on making this fight." The record shows that there was at that time a petition pending in the supreme court of Idaho for a rehearing of the mandamus case, which, however, was finally disposed of within a few days thereafter by a denial of it. This statement of Clark as to their wishes in regard to the extension sought cannot be reconciled with the statement of Hanley, which is not denied, that Sweeny applied for a further extension of time within which to take the one-third interest in September, 1898. As a matter of fact, the extension was granted in the case of each of the escrows, that on the envelope calling for the additional payment of $18,000 in these words:

"I hereby extend the above escrow to Sept. 20th, 1898.
"Spokane, W., June 6, '98. Kennedy J. Hanley."

—And that on the envelope calling for the payment of $10,000:

"I hereby extend the above escrow to Sept. 20th, 1898.
"Spokane, W., June 7, '98. Kennedy J. Hanley."

The $2,000 payment in consideration of the extension was evidenced by writing as follows:

"Spokane, June 7, 1898.
"E. J. Dyer, Csh.: This is to certify that Clark and Sweeny have paid $2,000.00 on the $18,000.00 escrow agreement due Sept. 20, 1898; so that only $16,000.00 is due on same. Kennedy J. Hanley."

Clark testified that, as soon as the papers were left in escrow at the bank on April 30, 1898, he went back to his office, where Goodspeed, his clerk, said to him, "Give me a description exactly what those envelopes contained, so that I can keep track of them," and that he replied "that the $18,000 envelope,—the one that we were required to pay on July 1st,—contained an eighth interest in the Skookum and 100,000 shares of Chemung stock," and that the other contained "one-third interest to the Skookum property, which was payable on August 1st," and that Goodspeed "at once sat down and prepared a copy of the two escrow agreements, and added to each copy the distinguishing statement that I made to him," which were afterwards put in their letterpress book. Clark further testified that at the time he and Hanley were talking about the June extension he called for the letterpress book, and read to Hanley therefrom a "description of the escrows, and the memorandum which described what the envelopes contained, which," added the witness, "was necessary for me to know and for Mr. Hanley to know in order to know what we were paying on when we went down to the bank." This statement of Clark is denied by Hanley, who says that the letterpress book was not shown to him in June at all, but was shown to him by Sweeny on the 17th of September, whereupon he disputed

it, and went at once to the bank, and told Dyer, "I am dealing with two rascals, and I want you to watch the escrows." Although Dyer was a witness on behalf of the defendants, he was not asked anything in respect to this testimony of Hanley. While the indorsements on the envelopes did not mention their contents, the amounts specified to be paid as a condition to their delivery plainly showed the one that covered the Chemung stock, and also—if Clark and Sweeny's version of the agreement be true—the deed for the one-eighth interest in the mine. There was, therefore, no such necessity as that testified to by Clark of resorting to the memorandum that he had caused to be entered in the letterpress book of Clark and Sweeny, nor any occasion whatever to resort to anything but the indorsements on the envelopes to know which covered the Chemung stock; for the balance required to take up the contents of that envelope was there expressly declared to be $18,000. If the agreement really was, as is contended on the part of the defendants, that that envelope should—as in fact it did—also contain the deed for the one-eighth of the Skookum mine, there would not have been the slightest occasion for Clark or Sweeny to have called Hanley's attention to any memorandum that they made in their office in respect to the matter. The fact of the making of the memorandum, and especially Clark's testimony in respect to it, we cannot but regard as suspicious. Looking at all of the facts and circumstances of the case, and carefully weighing them, we are satisfied that the truth is that the one-eighth interest in the mine was not, by the agreement of the parties, coupled with the Chemung stock; that the deed therefor was improperly placed in the envelope containing the stock; and that Clark and Sweeny received it without consideration, and in fraud of Hanley's rights. The judgment is reversed, and cause remanded to the court below for further proceedings not inconsistent with this opinion.